## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EDWARD RUEHL, Individually** | : | **Civil No. 1:15-CV-168** |
| **and as Administrator of the Estate** | : | |
| **of Shirley T. Ruehl, deceased,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **S.N.M. ENTERPRISES, INC.,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

### I.    Introduction

Expert witnesses play a unique, and uniquely important, role in our system of justice. Drawing upon their experience and training, expert witnesses often provide vitally important testimony which aids judges and juries in navigating the increasingly complicated and technical issues raised by litigation in our modern and complex society. In fulfilling this role, expert witnesses enhance the quality of justice for all who come before the courts.

The role of the expert witness is particularly crucial in complex, technological tort cases. As we have observed:

> Pennsylvania law recognizes that proving the elements of these claims
> in complex tort cases often requires presentation of expert testimony.
> This requirement is imposed by Rule in professional malpractice

1

negligence actions and requires a certificate of merit from an expert witness to sustain such a claim. See Pa.R.C.P. No. 1042.3. In other complex tort actions, such as product liability cases, courts have also opined that expert witnesses are often necessary to establish liability. Further, courts recognize that there are consequences which flow from a failure to provide such proof. Where a tort action turns on allegations of a technical nature relating to some alleged defect in a product, and the Plaintiff has failed to provide expert proof identifying the defect in the product or drawing a causal connection between that allegedly defective product and the Plaintiff's injuries, courts have held that product liability and related negligence claims fail as a matter of law and must be dismissed. See e.g. Mays v. Gen. Binding Corp., No. CIV. 11-5836 JBS/JS, 2013 WL 1986393, at *6 (D.N.J. May 10, 2013), aff'd, 565 F. App'x 94 (3d Cir. 2014); Ellis v. Beemiller, Inc., 910 F. Supp. 2d 768, 774 (W.D. Pa. 2012); Mracek v. Bryn Mawr Hosp., 610 F. Supp. 2d 401, 402 (E.D. Pa. 2009), aff'd, 363 F. App'x 925 (3d Cir. 2010); McCracken v. Ford Motor Co., 392 F. App'x 1, 4 (3d Cir. 2010); Koplove v. Ford Motor Co., 795 F.2d 15, 17 (3d Cir. 1986). The only exception to this general rule under Pennsylvania exists with respect to negligence claims "where the matter is ' "so simple, and (the) lack of skill or want of care so obvious, as to be within the range of ordinary experience and comprehension of even nonprofessional persons." ' Berman, supra, 205 F.Supp.2d at 364 (citing Brannan v. Lankenau Hospital, 490 PA 588 (1980))." Hakeem v. Salaam, No. CIV.A. 3:03-0098, 2006 WL 4130488, at *7 (M.D. Pa. July 18, 2006), subsequently aff'd, 260 F. App'x 432 (3d Cir. 2008).

American Power, LLC., v. Speedco Inc., No. 1:15-CV-2091, 2017 WL 4084060, at *6 (M.D. Pa. Jan. 17, 2017).

Along with this important role come great responsibilities for the ethical expert witness. At the outset, the ethical expert witness shares a duty with all witnesses to appear as commanded, and testify truthfully in the time, place and manner directed by the court in accordance with the law. In addition the ethical

expert witness owes a second, and equally important, obligation to the party that has retained that expert. For the party who is seeking relief from the courts the expert's testimony may be an integral or indispensable element of proof at trial. Recognizing that the party who has retained an expert is relying upon that expert to assist in carrying the party's burden of proof, an ethical expert has a legal, ethical and moral responsibility to refrain from gratuitously abandoning the party who has retained the expert's services.

The instant case, which comes before the court for consideration of a motion filed by the defendant and joined in by the plaintiff to sanction a non-party plaintiff's expert witness, Michael Panish, (Doc. 64), presents the story of a shocking dereliction of these basic duties owed by an expert to litigants, the court, and the cause of justice. Accordingly, for the reasons set forth below, we will GRANT this motion for sanctions.

## II.   <u>Factual Background</u>

This sanctions motion arose out of a technological tort case filed in this court. With respect to this underlying tort case, the pertinent facts are that in August of 2013, an elderly couple, Shirley and Edward Ruehl, traveled to Gettysburg, Pennsylvania on a sightseeing vacation trip. At Gettysburg, the Ruehls checked into the Hampton Inn operated by the defendant, SNM Enterprises. The

Hampton Inn's main entranceway was marked by automated sliding glass doors, which operated on electronic sensors, opening and closing as persons approached the door and entered or exited the hotel.

On the afternoon of August 13, 2013, Shirley Ruehl attempted to pass through these sliding glass doors. Mrs. Ruehl then fell outside the hotel, within several feet of the sliding glass doors, striking her head and fracturing her skull. The parties hotly disputed what caused Mrs. Ruehl to fall. For its part, SNM's desk clerk on duty has described Mrs. Ruehl as exhibiting a "steady, slow paced" gait, which made the clerk "nervous," and SNM posited that Mrs. Ruehl simply lost her balance and fell as she left the hotel. In contrast, the Plaintiff cited the statements of another hotel guest, Brian Leposki, who reported that Mrs. Ruehl fell when she was struck on her right side by the closing automatic door as she was entering the hotel. According to Mr. Leposki, the force of this blow caused Mrs. Ruehl to lose her balance and fall, landing in a seated position. Mrs. Ruehl's momentum then carried her over into a prone position and she struck her head upon the concrete. (Id.) Thus, the Plaintiff asserted that the negligent operation and maintenance of the automatic doors caused Mrs. Ruehl's fall.

With the issues framed in this fashion, the plaintiffs sought out Michael Panish as an expert witness in this case. At the time that the plaintiffs contacted

Panish he held himself out as an expert in multiple construction and building disciplines, and specifically asserted that he was a premier expert witness in the field of automated sliding glass door technology. Panish also asserted that he had served as an expert witness in over 1,000 cases, an attestation which if credited would mean that Panish was thoroughly conversant with his legal and ethical obligations as an expert witness.

Relying upon Panish's representations, the plaintiffs retained him in April of 2014 to perform an expert analysis in this case, and ultimately paid Panish more than $20,000 for his expert services in this litigation. With the clarity of hindsight, Panish's April 2014 contract with plaintiffs' counsel concealed within it the seeds of this dispute, since that contract indicated that "Mr. Panish retains the right to approve video deposition," (Doc. 76-1), although nothing in this agreement foreshadowed the curious and categorical refusal of Panish to comply with court orders, or attend videotape depositions.

Panish, however, now attests that he has a longstanding, if odd, speculative, and categorical approach to what is a commonplace practice that is specifically authorized by the Federal Rules of Civil Procedure—videotaped depositions of witnesses, including expert witnesses. Indeed, according to a declaration filed by Panish he generally refuses to allow videotaped depositions but has on one

occasion allowed such a deposition provided that "my face was not shown." (Doc. 85-1, ¶6.) As it has been explained to the court in prior proceedings, this singular circumstance, an expert witness who refuses to allow his face to be seen on video, apparently stems from some concern on Panish's part that unknown and unnamed persons will digitally alter the video in ways that will be detrimental to Panish. In nearly four decades of legal practice devoted exclusively to federal court litigation we have never encountered such an idiosyncratic view by any lay or expert witness, and we credit the plaintiffs' counsel's testimony that the stridency of Mr. Panish's eccentric views was entirely unknown to them when they first contracted with him to perform expert services in this case in April of 2014.

Instead, it appears that plaintiffs' counsel received their first direct notice of the adamancy of Panish's opposition to being videotaped some two years later, in the Spring of 2016. At that time, Mr. Panish appears to have communicated to plaintiffs' counsel that he would resist any effort to take his testimony through a videotaped deposition. Panish's announcement at this late date in the litigation created a dilemma for plaintiffs' counsel, who had retained Panish, and paid him considerable sums only to now have these additional conditions imposed upon them as absolute prerequisites for Panish's continued cooperation in this litigation.

The dilemma created by Panish's conduct then came to a head in March of 2017, when the defendant scheduled a videotaped deposition of Panish, something they were entitled to do under the Federal Rules of Civil Procedure. For his part, Panish appears to have demanded, and accepted, a pre-payment of his expert witness fees in the amount of $3,050 from the defendant for sitting for this deposition. (Hearing Exhibit D-1.) However, even as he accepted this money from the defendant, Panish was apparently notifying plaintiffs' counsel that he would not voluntarily agree to participate in this deposition. Presented with this notice of deposition, and confronted with Panish's curious reluctance to consent to a videotaped deposition, plaintiffs' counsel acted in a scrupulous fashion, bringing this dilemma to the court's attention and vigorously advocating on Mr. Panish's behalf. However, despite counsel's advocacy on behalf of Mr. Panish, following a conference with counsel on March 17, 2017, we entered an order in this matter which provided in clear and precise terms as follows:

> Recognizing that the defendant has a right to record Mr. Panish's deposition by video, and finding that the plaintiff has not demonstrated sufficient good cause for the issuance of a protective order, IT IS ORDERED THAT the plaintiff's request for a protective order to preclude the video recording of Mr. Panish's deposition is DENIED. The defendant shall be permitted to record Mr. Panish's deposition by video and stenographic means.

> In order to address Mr. Panish's concerns, however; and to memorialize the defendant's representations regarding the intended

use of the video recording of the deposition, IT IS FURTHER ORDERED THAT the parties shall use Mr. Panish's recorded deposition only for purposes of defending or prosecuting the claims in this litigation, and shall not disseminate the recording outside of these proceedings in the absence of a Court order.

(Doc. 57, p. 6.)

Thus, our order directed a videotaped deposition of Mr. Panish, but thoroughly addressed Panish's odd and speculative concern that his visage and words would be digitally altered by unknown sinister actors by setting strict limitations on the dissemination of the video.

Our March 17 order gave Mr. Panish a few clear choices. He could comply with the order. He could seek timely reconsideration of the order. He could through separate counsel file his own motion for protective order, or motion to quash the deposition subpoena that the defendant was attempting to serve upon him. The one thing he could not do, however, was to engage in some unilateral passive-aggressive course in which he ostensibly agreed to schedule a deposition, while privately evading his basic obligation owed by all witnesses by failing to appear for that deposition.

Yet this is precisely the path that Panish chose.

Mr. Panish responded to this clear direction from this court, and the plain dictates of the Federal Rules of Civil Procedure, in a fashion which was deceptive,

occasionally profane, highly unprofessional, contumacious and sanctionable. At the outset, according to the testimony and contemporaneous notes of plaintiffs' counsel which we find to be entirely credible, when notified by plaintiffs' counsel following the court's conference call with the parties that the court had denied his request for a protective order which would have forbidden this videotaped deposition Mr. Panish replied: "I don't care about you or her [the decedent plaintiff, Shirley Ruehl] or some asshole judge." (Doc. 86-1.)[1] Indeed, when plaintiffs' counsel appealed to Panish's conscience by noting that the family of the deceased plaintiff, Shirley Ruehl, was counting upon his testimony and assistance, Panish responded in a manner that was cold, calculating and cruel, reportedly stating that: " Nothing will bring her back so who gives a shit." (Id.)

Curiously, at the same time that Panish was presenting his refusal to participate in a videotaped deposition in profane terms as some matter of principle, he was also willing to forego that principle for a price. Specifically, Panish

---

[1] Panish's ability to engage in this profane exchange with plaintiffs' counsel following the entry of our March 17 order is itself something of a mystery since Panish cancelled the deposition that was scheduled in this case for March 20, 2017, claiming that he had suddenly contracted laryngitis, but apparently felt well enough to contemporaneously tell plaintiffs' counsel over the telephone that he did not "give[] a shit" about his client, Shirley Ruehl, who had allegedly died as a result of injuries suffered in this accident. Presented with this minor mystery, we are left to conclude that Panish's laryngitis, like his loyalty to his own client, was fleeting and episodic.

concedes that he told plaintiffs' counsel that he would surrender his principles on this score if they provided him a $10,000,000 indemnity bond from Lloyds of London. Plaintiffs' counsel understandably discounted this bizarre and extortionate suggestion.

Yet at the same time that Panish was privately voicing his complete disdain for this court's order and his own client, he was ostensibly complying with the order by making scheduling arrangements for this deposition in April of 2017. In fact, the email communications between counsel and Panish's office manager, Sharon Darian, reveal that the April 18, 2017 deposition date and location was specifically selected by, and approved by, Panish. As this deposition date approached, the defendant made several unsuccessful efforts to serve a deposition subpoena upon Panish, both in New Hampshire and in California. Moreover, plaintiffs' counsel reached out to Panish on a number of occasions through his office manager, Sharon Darian, by email to confirm and prepare for this deposition. Thus, it is clear beyond any question that Panish's office manager, who identified herself to the parties as Sharon Darian, had a month's advance notice of this deposition date and time, and had agreed to that date for this deposition. We impute this knowledge to Panish himself since we learned at the sanctions hearing in this case that Sharon Darian is actually Sharon Panish, Michael Panish's

spouse.[2]   Panish also retained the $3,050 advance he had received from the defendant as payment for this deposition, keeping and using those funds for his own benefit for some eight months before surrendering these funds which he had obtained on the pretext that he would undergo a deposition on the eve of the sanctions hearing set in this case. Moreover, even the belated surrender of these funds by Panish came only after the court entered an order explicitly instructing him to return this money. Further, having scheduled this deposition at his convenience on April 18, 2017 in Manchester, New Hampshire, Panish caused the parties to incur additional substantial expenses associated with the deposition, expenses which a moment's candor and honesty on Mr. Panish's part could have avoided.

On April 18, 2017, Panish failed to appear for this deposition without any prior explanation or excuse from the court, or counsel. Panish's failure to appear, and his apparent disregard of this court's explicit instructions, had a series of adverse consequences for the plaintiffs who had retained him. First, the plaintiffs

_____

[2] We are also constrained to note that Mrs. Panish has filed an affidavit with the court denying receipt of some email messages relating to the scheduling of this deposition. (Doc. 85-1.) In light of the evidence presented at the sanctions hearing--which conclusively demonstrated that all of the emails were sent to the same email address, an address provided by the Panishes and an address from which Sharon Panish had routinely replied to emails in the past—we do not credit this assertion by Mrs. Panish which is contradicted by all of the objective evidence in this case.

were placed in the difficult position of trying to defend Panish's indefensible conduct, filing pleadings seeking to set aside our March 17 order, an order Panish had effectively ignored. (Docs. 62 and 63.) The plaintiffs were also compelled to negotiate a settlement of this lawsuit from a highly disadvantageous position, since Panish's abandonment of the plaintiffs and refusal to cooperate in this deposition greatly undermined their case. Panish's course of conduct also had an adverse impact upon the defendant, who were denied information relevant to their defense of this case, expended thousands of dollars to schedule this deposition, and paid $3,050 to Panish for his services, money that Panish retained for months despite never living up to his obligations as a witness.

It is against this backdrop that the defendant moved to sanction Panish. (Doc.64.) The plaintiffs have now joined in this motion, (Doc. 76), and after unsuccessful efforts by the parties to serve Panish,[3] the court through the U.S.

---

[3] Mr. and Mrs. Panish deny evading service of process, (Docs. 85-1 and 85-2), but the facts belie these assertions since the defendant has credibly alleged that: "We had hired process servers who made four unsuccessful attempts at various times of day, between August 24th and August 28th, to serve Mr. Panish at his last known address in New Hampshire; and six unsuccessful attempts at various times of day, between August 23rd and September 2nd, to serve Mr. Panish at his other last known address in Southern California." (Doc. 80.) Mr. and Mrs. Panish, who represent that they have participated in more than 1,000 lawsuits in Mr. Panish's capacity as an expert witness, would be well advised to keep in mind the fundamental truth that there is often little to be gained, and much to be lost, by needlessly evading and avoiding service of process.

Marshal's Service effected service upon Panish. Panish then filed a response to this motion, along with a demand that the plaintiffs' law firm be sanctioned. (Doc. 85.) Panish's accusations against this law firm, in turn, compelled the plaintiffs' counsel to submit a reply, a reply which revealed in specific detail Panish's stated contempt for the court and indifference to his own professional obligations to Mrs. Ruehl, his client who had lost her life, as to whom Panish is reported to have said: "Nothing will bring her back so who gives a shit." (Doc. 86.) We have also conducted a hearing in this case, giving all parties a full opportunity to be heard on this matter.[4]

Having conducted these proceedings and carefully weighed the arguments of all counsel, the parties' motion for sanctions will be GRANTED and Panish's request for sanctions is DENIED.

---

[4] Panish was represented by recently retained counsel at this hearing. While our decision in this matter is necessarily, and we believe justifiably, critical of Panish's conduct prior to retaining the services of his counsel, nothing in this decision should be construed as criticizing the performance of Panish's counsel. Quite the contrary, in a difficult setting counsel acquitted himself well, displaying candor and diligence, while zealously advancing his client's interests.

## III. Discussion

### A. Sanctions Motions—Standard of Review

We are presented in this case with a singular circumstance and one without precedent in our experience: An expert witness who accepted thousands of dollars from a defendant to appear for what was later ordered to be a videotaped deposition, and then retained this money under false pretenses for months after he failed to appear and testify. We are also presented with an expert witness who voiced his contempt for the court and his own client in profane terms before he specifically scheduled, and then failed to appear, for a videotaped deposition that was ordered by this court.

This extraordinary act, in turn, calls upon us to consider some familiar legal tenets regarding the power of the  It is well-settled that a district court has the inherent power to sanction parties appearing before it for refusing to comply with its orders and to control litigation before it.  See, e.g., Tracinda Corp. v. DaimlerChrysler AG, 502 F.3d 212, 242 (3d Cir. 2007).  Indeed, the inherent power of the Court to act in this area has long been recognized by the United States Supreme Court, which has held that:

> It has long been understood that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution," powers "which cannot be dispensed with in a Court,

because they are necessary to the exercise of all others." <u>United States v. Hudson</u>, 7 Cranch 32, 34, 3 L.Ed. 259 (1812); see also <u>Roadway Express, Inc. v. Piper</u>, 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980) (citing <u>Hudson</u> ). For this reason, "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." <u>Anderson v. Dunn</u>, 6 Wheat. 204, 227, 5 L.Ed. 242 (1821); see also <u>Ex parte Robinson</u>, 19 Wall. 505, 510, 22 L.Ed. 205 (1874). These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." <u>Link v. Wabash R. Co.</u>, 370 U.S. 626, 630-631, 82 S.Ct. 1386, 1388-1389, 8 L.Ed.2d 734 (1962).

<u>Chambers v. NASCO, Inc</u>. 501 U.S. 32, 43 (1991).

Decisions regarding how to exercise this inherent power to sanction misconduct rest in the sound discretion of the court and, if a district court awards sanctions pursuant to its inherent authority, such an award may only be reviewed for abuse of discretion, which will be found only where "the court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." <u>In re Prudential Ins. Co. Am. Sales Practice Litig. Actions</u>, 278 F.3d 175, 181 (3d Cir. 2002) (quoting <u>In re Orthopedic Bone Screw Products Liability Litig.</u>, 193 F.3d 781, 795 (3d Cir. 1999)).

Yet while this court doubtless has the discretion to order imposition of sanctions in appropriate cases, the exercise of this discretion is guided by certain basic principles. Foremost among these principles is the tenet that sanctions should always be narrowly tailored to meet the misconduct, and should entail no greater punishment than is reasonably necessary to address the specific wrongdoing that confronts the court. See Klein v. Stahl, GMBH & Co., Maschinefabrik, 185 F.3d 98 (3d. Cir. 1999).This basic, but pivotal, aspect of the exercise of discretion in this area, has been voiced in many ways. Thus, it is well established that, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion. A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." Chambers v. NASCO, Inc. 501 U.S. at 44-45 (citation omitted). Therefore, in exercising this authority we are cautioned that:

> [A] district court must ensure that there is an adequate factual predicate for flexing its substantial muscle under its inherent powers, and must also ensure that the sanction is tailored to address the harm identified. In exercising its discretion under its inherent powers, the court should be guided by the same considerations that guide it in the imposition of sanctions under the Federal Rules. First, the court must consider the conduct at issue and explain why the conduct warrants sanction.

Republic of Philippines v. Westinghouse Elec. Corp. 43 F.3d at 74.

Moreover:

> [H]aving evaluated the conduct at issue, the district court must specifically consider the range of permissible sanctions and explain why less severe alternatives to the sanction imposed are inadequate or inappropriate. Although the court need not "exhaust all other sanctioning mechanisms prior to resorting to its inherent power" (Landon v. Hunt, 938 F.2d at 450, 454 (3d Cir.1991)), the court must explain why it has chosen any particular sanction from the range of alternatives it has identified. See Poulis, 747 F.2d at 868 (sanctions under Fed.R.Civ.P. 16 and 37).

Id.

Likewise, Rule 37 of the Federal Rules of Civil Procedure also recognizes and permits imposition of sanctions upon parties and deponents who shirk or unjustifiably ignore their responsibility to appear as witnesses in civil proceedings. See Fed. R. Civ. P. 37, Rule 37(b) and (d). Thus, "under Federal Rule of Civil Procedure 37(b)(1), a deponent may be sanctioned for failure to comply with a court order. Id. 37(b)(1) ('If the court where the discovery is taken orders a deponent to be sworn or to answer a question and the deponent fails to obey, the failure may be treated as contempt of court.'). The Third Circuit has explained Rule 37(b)(1) 'grants a district court the authority to punish a nonparty for failing to follow the court's directions.' Gen. Ins. Co. of Am. v. E. Consol. Utilities, Inc., 126 F.3d 215, 220 n. 3 (3d Cir.1997) (citing Miller v. Transamerican Press, Inc.,

709 F.2d 524 (9th Cir.1983) for the proposition that that Rule 37(b)(1) sanctions may be available against a nonparty deponent who failed to appear at a deposition in violation of a court order)." <u>Yarus v. Walgreen Co.</u>, No. CIV.A. 14-1656, 2015 WL 4041955, at *3 (E.D. Pa. July 1, 2015). Further, settled case law acknowledges that "sanctionable misconduct by . . . non-party witnesses can take many forms, including: failures to appear, <u>General Ins. Co. Of America v. Eastern Consolidated Utilities, Inc., supra</u>; destruction of evidence; <u>Helmac Products Corporation v. Roth Corporation, supra</u>; or giving false, misleading and materially incomplete testimony. <u>Black Horse Lane Assoc., LP v. Dow Chemical Corp.</u>, 228 F.3d 275, 300–305 (3d. Cir.2000). In all of its varied forms, this misconduct by non-parties and witnesses may, and properly should, be the subject of sanctions. <u>Id</u>." <u>Bartos v. Pennsylvania</u>, No. CIV.1:08-CV-0366, 2010 WL 1816674, at *5 (M.D. Pa. May 5, 2010).

It has long been held that decisions regarding sanctions motions are "committed to the sound discretion of the district court." <u>DiGregorio v. First Rediscount Corp</u>., 506 F.2d 781, 788 (3d Cir. 1974). This far-reaching discretion extends to rulings by United States Magistrate Judges on discovery matters. In this regard:

> District courts provide magistrate judges with particularly broad discretion in resolving discovery disputes. <u>See Farmers & Merchs.</u>

Nat'l Bank v. San Clemente Fin. Group Sec., Inc., 174 F.R.D. 572, 585 (D.N.J.1997). When a magistrate judge's decision involves a discretionary [discovery] matter . . . , "courts in this district have determined that the clearly erroneous standard implicitly becomes an abuse of discretion standard." Saldi v. Paul Revere Life Ins. Co., 224 F.R.D. 169, 174 (E.D.Pa.2004) (citing Scott Paper Co. v. United States, 943 F.Supp. 501, 502 (E.D.Pa.1996)). Under that standard, a magistrate judge's discovery ruling "is entitled to great deference and is reversible only for abuse of discretion." Kresefky v. Panasonic Commc'ns and Sys. Co., 169 F.R.D. 54, 64 (D.N.J.1996); see also Hasbrouck v. BankAmerica Hous. Servs., 190 F.R.D. 42, 44-45 (N.D.N.Y.1999) (holding that discovery rulings are reviewed under abuse of discretion standard rather than de novo standard); EEOC v. Mr. Gold, Inc., 223 F.R.D. 100, 102 (E.D.N.Y.2004) (holding that a magistrate judge's resolution of discovery disputes deserves substantial deference and should be reversed only if there is an abuse of discretion).

Halsey v. Pfeiffer, No. 09-1138, 2010 WL 3735702, *1 (D.N.J. Sept. 17, 2010).

Guided by these legal guideposts, we turn to a consideration of Panish's conduct in this case.

## B. Panish Has Engaged in Sanctionable Misconduct

Upon a consideration of all of the evidence in this case we conclude that by failing to appear for the deposition which he specifically scheduled; ignoring the court's order directing a videotaped deposition; abandoning and profanely disparaging his client, an 80 year-old decedent; and for months misappropriating a

$3,050 witness fee tendered to him as payment for the deposition which he willfully ignored Michael Panish engaged in conduct which was improper, unethical, contumacious, and sanctionable.

In our view this conduct is both sanctionable, and particularly egregious for a number of reasons.

First, the conduct at issue here involved a dual dereliction of the duty of candor and cooperation that Panish as a witness owed to this court, as well as the duty of loyalty Panish owed to his clients who had paid him more than $20,000 and were relying upon him to provide crucial expert testimony in this case.

Second, we find that Panish's excuses for failing to abide by these dual legal and ethical responsibilities utterly lack credibility. In essence, Panish appears to justify this misconduct by claiming that his unilateral interpretation of the court's order directing a videotaped deposition allowed him the option of completely abandoning this case. To the extent that Panish implies that this court could not direct him to participate in a videotape deposition, he is simply wrong. Quite the contrary, the Federal Rules of Civil Procedure expressly authorize the party noticing a deposition to choose the manner in which to record the deposition. Fed. R. Civ. P. 30(b)(3)(A). Courts have for years recognized that audio and visual

recordings of depositions are "routine". <u>Gillen v. Nissan Motor Corp</u>., 156 F.R.D. 120, 122 (E.D. Pa. 1994). Courts have thus long held that "the use of videotaped testimony should be encouraged and not impeded because it permits the jury to make credibility determinations not available when a transcript is read by another." <u>Weiss v. Wayes,</u> 132 F.R.D. 152, 155 (M.D. Pa. 1990). In contrast to a written transcript, a video allows lawyers and factfinders to assess "demeanor and appearance of the witness," <u>id.,</u> and courts have found that "facial expressions, voice inflection and intonation, gestures, 'body language' . . . may all express a message . . . ." <u>Fanelli v. Centenary College,</u> 211 F.R.D. 268, 270 (D.N.J. 2002) (quoting <u>Riley v. Murdock,</u> 156 F.R.D. 130, 131 (E.D.N.C. 1994)). Therefore we had the right, and duty, to direct Panish to participate in this deposition.

Further, Panish's suggestion that his actions were an acceptable, and principled, interpretation of our order directing this videotaped deposition is risible in light of the undisputed evidence. It is clear that Panish did not approach his responsibilities in a principled way. Rather, his actions revealed petulance, deceit, dishonesty, and a fundamental disregard for the rights and interests of others. At the outset, Panish's contemporaneous statements, as recorded by plaintiffs' counsel in March of 2017 when Panish was notified of this Court's March 17 order directing this videotaped deposition, utterly demolish any claim that Panish was

acting in a principled way. Instead, these statements provide graphic confirmation of Panish's petulant and contumacious attitude, as Panish declared that "I don't care about you or [his deceased client, Shirley Ruehl] or some asshole judge." Panish's claims of principled resistance to a court order are further undermined by his apparent willingness to sell his principles in return for a $10,000,000 indemnity bond. Thus, Panish's pattern of misleading conduct designed to frustrate this court's order and the discovery process, coupled with his openly voiced contumacious disdain for his responsibility to the court and his own client, is sanctionable as contempt, an intentional "[d]isobedience or resistance to [a] lawful writ, process, order, rule, decree, or command." 18 U.S.C. § 401 (3).

Moreover, Panish's conduct was particularly egregious in two very fundamental ways. First, Panish harmed and prejudiced the defendant in this case. Panish denied this party information that may have been integral to its defense of this lawsuit. Worse, Panish's deceptive conduct in specifically scheduling a deposition and then failing to appear for that deposition resulted in significant litigation expenses for the defense. Worse yet, Panish took an expert witness fee of $3,050 from the defendant under false pretenses, and then improperly retained that fee for months after he failed to appear for this deposition.

Bur perhaps most egregious of all is the disservice which Panish did to his clients, Shirley and Edward Ruehl, an elderly couple who had retained his services to assist them in this litigation. Panish accepted more than $20,000 in payment for his professional services, services that were crucial to the prosecution of this lawsuit. Then once his service as an expert became unpleasant or inconvenient for Panish he abandoned his clients in ways which severely undermined their case. Moreover, Panish followed this course with a cruel, calculated disdain for those he was harming, stating of Shirley Ruehl, his client and an elderly woman who had died following this incident: " Nothing will bring her back so who gives a shit." While Panish may be completely indifferent to the plight he created for the Ruehls, we are not. Therefore, in an effort to assist Panish in locating his moral, legal and ethical compass we will impose the following sanctions in this case.[5]

---

[5] For his part, Panish has invited us to sanction plaintiffs' counsel, suggesting that counsel was responsible for the debacle created by Panish's abandonment of the Ruehls. (Doc. 85.)  Finding that Panish's conduct was wholly unjustified, and that no counsel could have anticipated the level of unreasonable, intemperate behavior exhibited by Panish, we decline this invitation. We will, however, consider Panish's observations regarding the terms of his contract and the prior notice he provided to plaintiffs' counsel of his refusal to submit to videotape depositions as a mitigating factor when assessing sanctions against Panish.

### C. The Court Will Impose Financial Sanctions Against Panish for the Expenses Directly Incurred by the Parties as a Consequence of Panish's Failure to Appear for this Deposition

In determining the appropriate sanctions for this misconduct by Panish we are mindful that sanctions should always be narrowly tailored to meet the misconduct, and should entail no greater punishment than is reasonably necessary to address the specific wrongdoing that confronts the court. See Klein v. Stahl, GMBH & Co., Maschinefabrik, 185 F.3d 98 (3d. Cir. 1999). Adopting this view, we conclude that the best, and most appropriate measure of sanctions in this case would be to compel Panish to reimburse both parties for the direct expenses they incurred as a result of Panish's sanctionable decision to forego the deposition that was rescheduled at his request.

In reaching this conclusion we recognize that the plaintiffs had invited us to compel Panish to repay his entire expert witness fee of more than $20,000 as a sanction for his misconduct. We have declined this invitation because we believe that such a sanction would not be narrowly tailored, as required by law. Several considerations have led us to this conclusion. First, it is apparent that Panish did provide some professional services prior to his unjustified failure to attend this deposition. Therefore, repayment of his entire fee would not be a specific and

narrowly tailored sanction. Further, in our view imposition of a sanction in the form of a repayment of all expert fees would require us to further foray into the contractual details of the arrangement between Panish and counsel, an arrangement that is marked by some conflicts and ambiguities. Since sanctions proceedings are ancillary to merits litigation, we will decline to engage in this effort which would needlessly prolong these proceedings.

Instead, as to the plaintiffs' motion for sanctions, IT IS ORDERED that on or before **December 15, 2017**, plaintiffs' counsel shall submit an itemized accounting of the expenses incurred by counsel in addressing Panish's sanctionable misconduct. This accounting should identify all time and expense incurred by counsel: (1) addressing Panish's objections to the notice of deposition which scheduled this videotaped deposition in March of 2017; (2) all costs, fees, and expenses incurred by counsel preparing for Panish's April 18, 2017 deposition; (3) all costs, fees and expenses incurred by counsel relating to motions practice undertaken by counsel in an effort to persuade this court to vacate the order which we have found that Panish disobeyed (Docs.62 and 63) ; and (4) all costs, fees and expenses incurred litigating this sanctions motion, including costs incurred rebutting Panish's own requests for sanctions. Panish may then lodge objections to any specific items claimed by the plaintiffs' counsel on or before **December 29,**

**2017.** Plaintiffs' counsel may then submit a reply brief in support of their claims costs, fees and expenses on or before **January 12, 2018**.

As for the defendant, the presentation made by the defendant at the sanctions hearing conducted in this case provides a full and complete basis for awarding as sanctions costs and expenses that were directly related to Panish's misconduct. Therefore, IT IS ORDERED that Panish shall pay the following as sanctions in this case to the defendants:

1.      $3.050.00 expert witness deposition fee.[6]

2.      $300.00 March 2017 deposition cancellation fee. (Exhibit D-2.)

3.      $1,045.00 April 2017 deposition fees and expenses, (Exhibits D-4 through D-6.)

4.      $481.75 Process service expenses.

TOTAL:      $4,876.75.

Finally, we recognize that Panish's misconduct may have broader significance beyond the contours of this case since Panish holds himself out as an expert witness in a wide array of disciplines, but has conducted himself in an

---

[6] It has been represented that this money has been reimbursed by Panish on the date of the sanctions hearing.

unprofessional fashion in this case. Mindful of the need to avoid future risk of harm to others, we note that Panish has claimed to be licensed by the State of California as a contractor, and has alleged that he is a member of the American National Standards Institute (ANSI). Since Panish's conduct in the instant case may be relevant to a consideration of his continued licensure by the state and membership in this professional association, IT IS ORDERED that the clerk will forward a copy of this decision to the appropriate licensing and professional association officials for whatever action they may deem appropriate.

So ordered this 28th day of November, 2017.


/s/ Martin C. Carlson
Martin C. Carlson
United States Magistrate Judge