# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EDWARD RUEHL, Individually** | : | **Civil No. 1:15-CV-168** |
| **and as Administrator of the Estate** | : | |
| **of Shirley T. Ruehl, deceased,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **S.N.M. ENTERPRISES, INC.,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

## I.    Factual Background

We now write a final, melancholy chapter in this lawsuit as we conclude sanctions litigation relating to the Plaintiffs' expert witness, Michael Panish. The background of these sanctions proceedings were thoroughly outlined by the court in its prior decision finding that Panish engaged in sanctionable misconduct. Ruehl v. S.N.M. Enterprises, Inc., No. 1:15-CV-168, 2017 WL 5749560, (M.D. Pa. Nov. 28, 2017). Briefly, though, Panish was retained as a critical liability expert by the Ruehl family following a mishap at a motel in which Mrs. Ruehl, an elderly motel patron was allegedly struck by a sliding door, suffering a severe fall which the Plaintiffs alleged ultimately caused her death.

With the issues framed in this fashion, the Plaintiffs sought out Michael Panish as an expert witness in this case. At the time that the Plaintiffs contacted Panish he held himself out as an expert in multiple construction and building disciplines, and specifically asserted that he was a premier expert witness in the field of automated sliding glass door technology. Panish also asserted that he had served as an expert witness in over 1,000 cases, an attestation which meant that Panish was thoroughly conversant with his legal and ethical obligations as an expert witness.

As discovery proceeded the defendant sought to take a videotaped deposition of Panish, a commonplace practice that is specifically authorized by the Federal Rules of Civil Procedure. Panish refused, citing a matter which he had obliquely alluded to in his expert witness contract with Plaintiffs' counsel, his odd, idiosyncratic view that the video could be manipulated by third parties. Following a conference with counsel on March 17, 2017, we entered an order in this matter which provided in clear and precise terms as follows:

> Recognizing that the defendant has a right to record Mr. Panish's deposition by video, and finding that the plaintiff has not demonstrated sufficient good cause for the issuance of a protective order, IT IS ORDERED THAT the plaintiff's request for a protective order to preclude the video recording of Mr. Panish's deposition is DENIED. The defendant shall be permitted to record Mr. Panish's deposition by video and stenographic means.

In order to address Mr. Panish's concerns, however; and to memorialize the defendant's representations regarding the intended use of the video recording of the deposition, IT IS FURTHER ORDERED THAT the parties shall use Mr. Panish's recorded deposition only for purposes of defending or prosecuting the claims in this litigation, and shall not disseminate the recording outside of these proceedings in the absence of a Court order.

(Doc. 57, p. 6.)

Thus, our order directed a videotaped deposition of Mr. Panish, but thoroughly addressed Panish's odd and speculative concern that his visage and words would be digitally altered by unknown sinister actors by setting strict limitations on the dissemination of the video.

Our March 17 order gave Mr. Panish a few clear choices. He could comply with the order. He could seek timely reconsideration of the order. He could through separate counsel file his own motion for protective order, or motion to quash the deposition subpoena that the defendant was attempting to serve upon him. The one thing he could not do, however, was to engage in some unilateral passive-aggressive course in which he ostensibly agreed to schedule a deposition, while privately evading his basic obligation owed by all witnesses by failing to appear for that deposition.

Yet this is precisely the path that Panish chose.

Mr. Panish responded to this clear direction from this court, and the plain dictates of the Federal Rules of Civil Procedure, in a fashion which was deceptive, occasionally profane, highly unprofessional, contumacious and sanctionable. At the outset, according to the testimony and contemporaneous notes of Plaintiffs' counsel which we find to be entirely credible, when notified by Plaintiffs' counsel following the court's conference call with the parties that the court had denied his request for a protective order which would have forbidden this videotaped deposition Mr. Panish replied: "I don't care about you or her [the decedent Plaintiff, Shirley Ruehl] or some asshole judge." (Doc. 86-1.)[1] Indeed, when Plaintiffs' counsel appealed to Panish's conscience by noting that the family of the deceased plaintiff, Shirley Ruehl, was counting upon his testimony and assistance, Panish responded in a manner that was cold, calculating and cruel, reportedly stating that: " Nothing will bring her back so who gives a shit." (Id.) Furthermore, while casting his position as a matter of principle, Panish was willing to surrender his principles for a price and told Plaintiffs' counsel that he would surrender his

---

[1] Panish's ability to engage in this profane exchange with Plaintiffs' counsel following the entry of our March 17 order is itself something of a mystery since Panish cancelled the deposition that was scheduled in this case for March 20, 2017, claiming that he had suddenly contracted laryngitis, but apparently felt well enough to contemporaneously tell Plaintiffs' counsel over the telephone that he did not "give[] a shit" about his client, Shirley Ruehl, who had allegedly died as a result of injuries suffered in this accident.

principles if they provided him a $10,000,000 indemnity bond from Lloyds of London.

Yet at the same time that Panish was privately voicing his complete disdain for this court's order and his own client, he was ostensibly complying with the order by making scheduling arrangements for this deposition in April of 2017. Panish also retained a $3,050 advance he had received from the defendant as payment for this deposition, keeping and using those funds for his own benefit for some eight months before surrendering these funds which he had obtained on the pretext that he would undergo a deposition on the eve of the sanctions hearing set in this case. On April 18, 2017, Panish failed to appear for this deposition without any prior explanation or excuse from the court, or counsel. Panish's failure to appear, and his apparent disregard of this court's explicit instructions, had a series of adverse consequences for the Plaintiffs who had retained him. First, the Plaintiffs were placed in the difficult position of trying to defend Panish's indefensible conduct, filing pleadings seeking to set aside our March 17 order, an order Panish had effectively ignored. (Docs. 62 and 63.) The Plaintiffs were also compelled to negotiate a settlement of this lawsuit from a highly disadvantageous position, since Panish's abandonment of the plaintiffs and refusal to cooperate in this deposition greatly undermined their case. Panish's course of conduct also had

5

an adverse impact upon the defendants, who were denied information relevant to their defense of this case, expended thousands of dollars to schedule this deposition, and paid $3,050 to Panish for his services, money that Panish retained for months despite never living up to his obligations as a witness.

It was against this backdrop that the Defendant moved to sanction Panish. (Doc.64.) The Plaintiffs also joined in this motion, (Doc. 76), and following a hearing we concluded that Panish had indulged in sanctionable misconduct. We granted the defendant's sanctions motion and awarded a sum certain in sanctions to the defendant. We further instructed the plaintiff and Panish to submit briefs and argument in support of the Plaintiffs' request for sanctions. The parties have fully briefed this issue and this matter is now ripe for resolution.

For the reasons set forth below, in the exercise of our discretion, we will award sanctions of $22,270.30 in favor of the Plaintiffs against Panish.

## II. <u>Discussion</u>

It is well-settled that a district court has the inherent power to sanction persons appearing before it for refusing to comply with its orders and to control litigation before it. <u>See, e.g.</u>, <u>Tracinda Corp. v. DaimlerChrysler AG</u>, 502 F.3d 212, 242 (3d Cir. 2007). Indeed, the inherent power of the Court to act in this area has long been recognized by the United States Supreme Court, which has held that:

It has long been understood that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution," powers "which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." <u>United States v. Hudson</u>, 7 Cranch 32, 34, 3 L.Ed. 259 (1812); see also <u>Roadway Express, Inc. v. Piper</u>, 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980) (citing <u>Hudson</u> ). For this reason, "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." <u>Anderson v. Dunn</u>, 6 Wheat. 204, 227, 5 L.Ed. 242 (1821); see also <u>Ex parte Robinson</u>, 19 Wall. 505, 510, 22 L.Ed. 205 (1874). These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." <u>Link v. Wabash R. Co.</u>, 370 U.S. 626, 630-631, 82 S.Ct. 1386, 1388-1389, 8 L.Ed.2d 734 (1962).

<u>Chambers v. NASCO, Inc</u>. 501 U.S. 32, 43 (1991).

Decisions regarding how to exercise this inherent power to sanction misconduct rest in the sound discretion of the court and, if a district court awards sanctions pursuant to its inherent authority, such an award may only be reviewed for abuse of discretion, which will be found only where "the court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." <u>In re Prudential Ins. Co. Am. Sales Practice Litig. Actions</u>, 278 F.3d 175, 181 (3d Cir. 2002) (quoting <u>In re Orthopedic Bone Screw Products Liability Litig.</u>, 193 F.3d 781, 795 (3d Cir. 1999)).

Yet while this court doubtless has the discretion to order imposition of sanctions in appropriate cases, the exercise of this discretion is guided by certain basic principles. Foremost among these principles is the tenet that sanctions should always be narrowly tailored to meet the misconduct, and should entail no greater punishment than is reasonably necessary to address the specific wrongdoing that confronts the court. See Klein v. Stahl, GMBH & Co., Maschinefabrik, 185 F.3d 98 (3d. Cir. 1999).This basic, but pivotal, aspect of the exercise of discretion in this area, has been voiced in many ways. Thus, it is well established that, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion. A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." Chambers v. NASCO, Inc. 501 U.S. at 44-45 (citation omitted). Therefore, in exercising this authority we are cautioned that:

> [A] district court must ensure that there is an adequate factual predicate for flexing its substantial muscle under its inherent powers, and must also ensure that the sanction is tailored to address the harm identified. In exercising its discretion under its inherent powers, the court should be guided by the same considerations that guide it in the imposition of sanctions under the Federal Rules. First, the court must consider the conduct at issue and explain why the conduct warrants sanction.

Republic of Philippines v. Westinghouse Elec. Corp. 43 F.3d at 74.

Moreover:

> [H]aving evaluated the conduct at issue, the district court must specifically consider the range of permissible sanctions and explain why less severe alternatives to the sanction imposed are inadequate or inappropriate. Although the court need not "exhaust all other sanctioning mechanisms prior to resorting to its inherent power" (Landon v. Hunt, 938 F.2d at 450, 454 (3d Cir.1991)), the court must explain why it has chosen any particular sanction from the range of alternatives it has identified. See Poulis, 747 F.2d at 868 (sanctions under Fed.R.Civ.P. 16 and 37).

Id.

Likewise, Rule 37 of the Federal Rules of Civil Procedure also recognizes and permits imposition of sanctions upon parties and deponents who shirk or unjustifiably ignore their responsibility to appear as witnesses in civil proceedings. See Fed. R. Civ. P. 37, Rule 37(b) and (d). Thus, "under Federal Rule of Civil Procedure 37(b)(1), a deponent may be sanctioned for failure to comply with a court order. Id. 37(b)(1) ('If the court where the discovery is taken orders a deponent to be sworn or to answer a question and the deponent fails to obey, the failure may be treated as contempt of court.'). The Third Circuit has explained Rule 37(b)(1) 'grants a district court the authority to punish a nonparty for failing to follow the court's directions.' Gen. Ins. Co. of Am. v. E. Consol. Utilities, Inc., 126 F.3d 215, 220 n. 3 (3d Cir.1997) (citing Miller v. Transamerican Press, Inc., 709 F.2d 524 (9th Cir.1983) for the proposition that that Rule 37(b)(1) sanctions

may be available against a nonparty deponent who failed to appear at a deposition in violation of a court order)." <u>Yarus v. Walgreen Co.</u>, No. CIV.A. 14-1656, 2015 WL 4041955, at *3 (E.D. Pa. July 1, 2015). Further, settled case law acknowledges that "sanctionable misconduct by . . . non-party witnesses can take many forms, including: failures to appear, <u>General Ins. Co. Of America v. Eastern Consolidated Utilities, Inc., supra</u>; destruction of evidence; <u>Helmac Products Corporation v. Roth Corporation, supra</u>; or giving false, misleading and materially incomplete testimony. <u>Black Horse Lane Assoc., LP v. Dow Chemical Corp.</u>, 228 F.3d 275, 300–305 (3d. Cir.2000). In all of its varied forms, this misconduct by non-parties and witnesses may, and properly should, be the subject of sanctions. <u>Id</u>." <u>Bartos v. Pennsylvania</u>, No. CIV.1:08-CV-0366, 2010 WL 1816674, at *5 (M.D. Pa. May 5, 2010).

Here we have found that Panish indulged in sanctionable misconduct. Our task, therefore, is to exercise our discretion and fashion a monetary sanction for these misdeeds that is sufficient, but not greater than necessary, to redress this misconduct.

In this phase of sanctions litigation, where an aggrieved party seeks the recovery of costs, expenses or attorney's fees, typically "[t]he starting point for a determination of attorney's fees, the lodestar calculation, is the product of the

number of hours reasonably expended in responding to the frivolous paper times an hourly fee based on the prevailing market rate." <u>Doering v. Union County Bd. of Chosen Freeholders</u>, 857 F.2d 191, 195 (3d Cir. 1988); <u>see also</u> <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 433 (1983). The party seeking fees bears the burden of producing "sufficient evidence of what constitutes a reasonable market rate for the essential character and complexity of the legal services rendered . . . ." <u>Knight v. Drye</u>, 2009 U.S. Dist. LEXIS 82369 (M.D. Pa. Sept. 10, 2009) (quoting <u>McCutcheon v. America's Servicing Co.</u>, 560 F.2d 143, 150 (3d Cir. 1990). <u>See also</u> <u>Pennsylvania v. Delaware Valley Citizens' Council for Clean Air</u>, 478 U.S. 546, 564 (1986) (party seeking fees has the initial burden of presenting evidence that the claimed rates and time expended are reasonable).

In the more familiar setting of fee-shifting awards, the Third Circuit has instructed that determining a reasonable hourly rate generally "is calculated according to the prevailing market rates in the relevant community." <u>Loughner v. Univ. of Pittsburgh</u>, 260 F.3d 173, 180 (3d Cir. 2001); <u>see also</u> <u>Interfaith Cmty. Org. v. Honeywell Int'l, Inc.</u>, 426 F.3d 694, 705 (3d Cir. 2005) (in most cases, the relevant market rate is the prevailing rate in the forum of the litigation). A court must not make a finding of reasonableness based on its own "generalized sense" of appropriateness, but instead "must rely on the record." <u>Evans v. Port Auth. of</u>

N.Y. and N.J., 273 F.3d 346, 361 (3d Cir. 2001) (quoting Smith v. City of Phila. Housing Auth., 107 F.3d 223, 225 (3d Cir. 1997)).  Courts are to "assess the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."  Maldonado v. Houstoun, 256 F.3d 181, 184 (3d Cir. 2001);   Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990).  The party seeking fees "bears the burden of establishing by way of satisfactory evidence, 'in addition to [the] attorney's own affidavits,' . . . that the requested hourly rates meet this standard."  Washington v. Philadelphia Cty. Ct. of Common Pleas, 89 F.3d 1031, 1035 (3d Cir. 1996) (citing Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984)).

With respect to calculating the number of hours reasonably expended, the court "should review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are 'excessive, redundant, or otherwise unnecessary.'" Public Int. Research Group of N.J., Inc. v. Windall, 51 F.3d 1179, 1188 (3d Cir. 1995) (internal citation omitted); see also Dellarciprete, 892 F.2d at 1183 ("The district court should exclude hours that are not reasonably calculated.").  In general, hours are not considered to have been reasonably expended "if they are excessive,

redundant, or otherwise unnecessary." Id. The court may permissibly deduct hours from the fee award if the attorney inadequately documents the hours claimed. Id.

Once the petitioning party has made the preliminary showing described above, "the resulting product is presumed to be the reasonable fee to which counsel is entitled." Id. The burden then shifts to the party opposing the claimed fees by making specific objections to the proposed fee by way of an affidavit or brief. Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990). Upon consideration of the opposing party's objections, the district court enjoys substantial discretion to adjust the lodestar and ultimate fee downward. Id.

One other consideration guides us when calculating attorneys' fees as monetary sanctions for alleged litigation misconduct. In addition to the traditional lodestar analysis, we note that in the context of sanctions – unlike in the more familiar fee-shifting context where a party is entitled to reasonable attorneys' fees and costs as a prevailing party – the court may only impose a sanction that represents "the minimum that will serve to adequately deter the undesirable behavior" that precipitated the sanction. Doering, 857 F.2d at 194 (citation omitted). Therefore, it is both necessary and appropriate to consider the various factors identified in Doering when considering a suitable monetary sanction in this

case. Indeed, the Third Circuit has made clear that district courts must consider these factors when determining the appropriate amount of attorney's fees to charge as sanctions. Id. at 195 ("We . . . direct the district courts to consider various mitigating factors in their calculation of the total monetary compensation owed by lawyers who have been found to have violated Rule 11."). The reason for these additional considerations is that fees imposed as a sanction implicate different policies than those that support fee shifting in favor of a prevailing party. See Doering, 857 F.2d at 196 ("The policy considerations behind fee awards to prevailing plaintiffs under civil rights statutes, however, are different from the policies underlying sanctions under Rule 11"). One particularly important consideration in determining an appropriate sanction is the violating party's ability to pay. Id. at 195. Other considerations that courts are expected to evaluate in assessing an appropriate attorney's fee as a sanction include: (1) the public's interest in encouraging certain types of lawsuits; (2) the sanctioned individual's history of alleged misconduct; (3) the opposing party's need for compensation; (4) the degree of frivolousness of the action; and (5) whether the frivolousness indicated that a less sophisticated or expensive response was required. Id. at 197 and n.6.

Guided by these legal tenets we turn to an evaluation of the Plaintiffs' claimed monetary sanctions. Those monetary sanctions begin with an itemized list of expenses relating to the litigation of this sanctions matter. (Doc. 94-2.) These itemized expenses included travel expenses, processing service expenses, and costs associated with online legal research. (Id.) According to the Plaintiffs these expenses, which were directly related to litigation of Panish's misconduct, totaled $1,317.30. (Id.) For his part, Panish has objected to these expenses, alleging that the travel expenses are excessive, and the service and online research expenses were unnecessary. (Doc. 95.)

We disagree. The travel costs claimed by Plaintiffs' counsel were plainly necessary and appropriate, since we had ordered the parties to appear for a hearing to address Panish's sanctionable misconduct. As for Panish's argument that the process server expenses were unnecessary, we have already found that: "Mr. and Mrs. Panish deny evading service of process. . . but the facts belie these assertions." Ruehl v. S.N.M. Enterprises, Inc., No. 1:15-CV-168, 2017 WL 5749560, at *5 n. 3 (M.D. Pa. Nov. 28, 2017). Given Panish's history of evading process, these expenses were both necessary and appropriate.

Finally, Panish argues that that the online legal research costs enumerated by the Plaintiffs' counsel should be disallowed as unnecessary. Online legal research

15

costs can be recovered as sanctions in appropriate instances, <u>Envtl. Mfg. Sols.,</u> <u>LLC v. Peach State Labs, Inc.</u>, 274 F. Supp. 3d 1298, 1329 (M.D. Fla. 2017), and we find that the unprecedented scope, nature and extent of Panish's misconduct as well as the unusual circumstance of a party seeking to sanction its own witness made such research prudent and proper. Therefore, Panish's objection to this element of the Plaintiffs' request for sanctions will be denied, and we will award $1,317.30 in costs as sanctions.

In addition to these direct costs, the Plaintiffs' counsel have also itemized attorneys' fees totaling $35,425.00, as a result of litigating the issues thrust upon the Plaintiffs by Panish's wholesale abandonment of his clients. These attorneys' fees represent 68.75 hours of work by Attorney Smith, billed at an hourly rate of $350, and an additional 25.25 hours of work by Attorney Regan, billed at an hourly rate of $450. (Doc. 94-1.) Panish has challenged this fees calculation on two grounds, arguing both that the hourly rate and the number of hours expended by counsel on this matter were excessive. (Doc. 95.)

Turning first to an assessment of the appropriate lodestar hourly rate, we note that:

> In determining a reasonable hourly rate for attorneys' fees analysis, that rate generally "is calculated according to the prevailing market rates *in the relevant community*." <u>Loughner v. Univ. of Pittsburgh</u>, 260 F.3d 173, 180 (3d Cir. 2001)(emphasis added). In most cases, the

relevant market rate is the prevailing rate in the forum of the litigation, in this case the Middle District of Pennsylvania. See Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 426 F.3d 694, 705 (3d Cir. 2005).

United States ex rel Sharon McKinney v. DHS Techs., LLC, No. 3:11-CV-146, 2015 WL 11675668, at *6 (M.D. Pa. Oct. 27, 2015), report and recommendation adopted sub nom. United States v. DHS Techs., LLC, No. 3:11-CV-146, 2016 WL 4592175 (M.D. Pa. Feb. 4, 2016).

Furthermore, when focusing on this regional legal market:

Applying this benchmark, we find that our own assessment of fee award hourly rates approved by the courts in this district within the past two years in complex litigation suggests that highly experienced attorneys of plaintiff counsels' background in this particular legal marketplace typically command a fee rate of between $250 and $325 per hour in such complicated cases. See e.g., Evankavitch v. Green Tree Servicing, LLC, No. 3:12CV2564, 2014 WL 4437645, at *2 (M.D. Pa. Sept. 9, 2014), appeal dismissed (Sept. 29, 2015) ($315); Summit Sheet Metal, LLC v. Sheet Metal Workers' Int'l Ass'n, No. 3:CV-13-1623, 2015 WL 163342, at *1 (M.D. Pa. Jan. 13, 2015) reconsideration denied sub nom. Summit Sheet Metal, LLC v. Sheet Metal Workers' Int'l Ass'n, Local Union No. 44, No. 3:CV-13-1623, 2015 WL 672398 (M.D. Pa. Feb. 17, 2015) ($305 per hour); Wallace v. Powell, 301 F.R.D. 144, 167 (M.D. Pa. 2014) ($300); Beattie v. Line Mountain Sch. Dist., No. 4:13-CV-02655, 2014 WL 3400975, at *9 (M.D. Pa. July 10, 2014)($250 to $325 per hour); J.S. ex rel. Snyder v. Blue Mountain Sch. Dist., No. 3:07CV585, 2014 WL 1321116, at *2 (M.D. Pa. Mar. 31, 2014)(hourly rate of $300); Lukawski v. Client Servs., Inc., No. 3:12-CV-02082, 2013 WL 6154544, at *3 (M.D. Pa. Nov. 22, 2013)($300 per hour rate).

Id.

In this case, we believe that Plaintiffs' counsel were exceptionally skilled

and able. Therefore, we will apply an hourly rate of $325, a sum which is at the

high end of the reasonable, customary lodestar regional hourly rate range previously determined by this court when making lodestar calculations.

Having found some merit to Panish's concerns regarding the hourly rate billed by Plaintiffs' counsel, we turn to the second aspect of the lodestar calculation, the evaluation of the number of hours billed by counsel. In this regard, Panish objects to the number of hours counsel claim to have expended in this sanctions litigation, arguing that the total of 94 hours billed by Plaintiffs' counsel addressing the issues created by their own expert witness' duplicity was excessive.

We disagree. On this score, we believe that Panish simply fails to recognize the chaos created by his deceitful conduct. As we have previously observed, Panish's actions constituted a shocking, and fundamental dereliction of his duty to Mrs. Ruehl. This conduct severely undermined the Plaintiffs' case, created a nightmarish host of difficulties for Plaintiffs' counsel, compelled extensive motions practice, and required an evidentiary hearing. Given the discord caused by his actions, it is hardly surprising that Plaintiffs' counsel were put to considerable time trying to address the incalculable damage done by their own expert witness to their case. Moreover, the time devoted to that effort, 94 hours, seems entirely appropriate given the gravity of Panish's misdeeds.

Having concluded that the number of hours expended here was fitting given the extraordinary scope and impact of Panish's misconduct, we conclude that a straightforward lodestar assessment yields a potential attorneys' fee of $30,550. (94 hours x $325 per hour). We are required, however, in this setting to go beyond a simple lodestar calculation and evaluate whether there are any mitigating circumstances which warrant a reduction in these fees. In fact, are cautioned that we should only impose a sanction that represents "the minimum that will serve to adequately deter the undesirable behavior" that precipitated the sanction. <u>Doering</u>, 857 F.2d at 194 (citation omitted).

Taking this final factor into consideration, we conclude that there are some mitigating factors in this case which justify a reduction in this attorneys' fee award. Specifically, as we observed in our prior decision on this sanctions motion, Panish's contract with Plaintiffs' counsel foreshadowed some of these issues, since that contract indicated that "Mr. Panish retains the right to approve video deposition." <u>Ruehl v. S.N.M. Enterprises, Inc.</u>, No. 1:15-CV-168, 2017 WL 5749560, at *2 (M.D. Pa. Nov. 28, 2017). Panish previously invited us to wholly exonerate him, and instead sanction Plaintiffs' counsel, based upon this contractual provision which he argued placed the blame entirely upon counsel for his professional shortcomings. We have refused, however, to wholly excuse Panish's

misconduct since Panish clearly disobeyed unambiguous orders of this court. Nonetheless, in our prior decision we recognized that this consideration was a mitigating factor, stating that:

> Finding that Panish's conduct was wholly unjustified, and that no counsel could have anticipated the level of unreasonable, intemperate behavior exhibited by Panish, we decline this invitation [to excuse Panish's conduct]. We will, however, consider Panish's observations regarding the terms of his contract and the prior notice he provided to plaintiffs' counsel of his refusal to submit to videotape depositions as a mitigating factor when assessing sanctions against Panish.

Ruehl v. S.N.M. Enterprises, Inc., No. 1:15-CV-168, 2017 WL 5749560, at *8 n. 5 (M.D. Pa. Nov. 28, 2017).

Taking this mitigating factor into consideration, we now conclude that this prior, albeit incomplete, notice which Panish provided to Plaintiffs' counsel regarding his reluctance to submit to videotape depositions warrants some significant mitigation of the attorneys' fees sanction otherwise called for in this case through a strict application of the lodestar analysis. In particular, we find that the appropriate amount of an attorneys' fee sanction in this case should be capped at $20,953.00, a sum which corresponds with the total amount paid by Plaintiffs' counsel to Panish in connection with this case. Mitigating the attorneys' fees sanction in this fashion is fair and just on several scores. First, it takes into account the unusual mitigating factor that Panish had to some degree foreshadowed to Plaintiffs' counsel his idiosyncratic fear of videotaped depositions at the outset of

his retention as an expert. However, this sanction, which equals the amounts paid to Panish by Plaintiffs' counsel, also ensures that Panish does not profit from his contumacious refusal to obey this court's order. Furthermore, the sanction imposed here reimburses the Plaintiffs' counsel for a significant proportion of their fees and all of their costs associated with Panish's ethical lapses. Finding that this sanction is fair, just, and no greater than necessary to achieve the objects of this sanctions litigation, we will impose an award of attorneys' fees in the amount of $20,953.00 in addition to the costs of $1,317.30, for a total sanction of $22,270.30.

An appropriate order follows:

## III.  Order

In accordance with the accompanying Memorandum Opinion, IT IS ORDERED that Panish shall pay the following as sanctions in this case to the Plaintiffs' counsel:

1.  $20,953.00 in attorneys' fees.

2.   $1,317.30 in costs.

TOTAL:  $22.270.30.

So ordered this 20th day of July, 2018.

/s/  Martin C. Carlson
Martin C. Carlson
United States Magistrate Judge